IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

01 MAR 30 AM 8: 51

CHARLES BEAMS, ET AL., )
)
    Plaintiffs, )
)
v. ) CIVIL ACTION NO. 98-PWG-3180-W
)
CITY OF NORTHPORT, ET AL., )
)
    Defendants. )

**ENTERED**

**MAR 3 0 2001**

### MEMORANDUM OF OPINION

    This court has jurisdiction over this action based on plaintiffs' counts for violation of 42 U.S.C. § 1983. Plaintiffs have also presented state law counts for assault,[1] negligence and violation of *Alabama Code* § 36-12-40. This action is before the magistrate judge pursuant to the written consent of the parties to the exercise of jurisdiction by the magistrate judge. 28 U.S.C. § 636(c) and LR 73.2.

    The following relevant facts are undisputed or, if disputed, viewed in the light most favorable to plaintiffs.[2] On the morning of January 27, 1998 Charles Beams was driving his 18 year old son, Heath Beams (Heath) to the Northport DCH Emergency Room. A pill had lodged in Heath's throat and he was choking. (Charles Beams Depo. at 132-134; Heath Beams Depo. at 25-27). Heath had a history of medical problems related to his esophagus, including several surgeries. (Charles Beams Depo. at 107-111,175).

---

[1]    In the complaint count two is labeled "assault–42 U.S.C. § 1983;" however, in plaintiffs' Memorandum in Response to Defendants' Motion for Summary Judgment, plaintiffs clearly state that count two is a state common law claim against defendant Zilke. (Plaintiffs' Memorandum in Response, unnumbered p.14).

[2]    Defendants filed a "Motion to Strike" certain exhibits attached to plaintiffs' Memorandum in Response to Defendants' Motion for Summary Judgment. The Motion to Strike (document #23) is DENIED; however, the exhibits and deposition excerpts complained of are not relevant to the issue of the constitutionality and duration of the detention which is the only issue addressed in Memorandum of Opinion.



As Charles and Heath Beams approached the intersection of Highways 43 and 82, the traffic had begun to back up on the highway. (Charles Beams Depo. at 139; Heath Beams Depo. at 25). Mr. Beams had his headlights and flashing lights on. (Charles Beams Depo. at 139). Mr. Beams pulled to the left and the driver of a transfer truck ahead of the Beamses waved them forward. (Charles Beams Depo. at 139-140; Heath Beams Depo. at 25). Mr. Beams pulled into the turn lane. (Charles Beams Depo. at 140; Heath Beams Depo. at 25-26). He pulled up beside a Northport police car. He motioned for the police officer to follow him. (Charles Beams Depo. at 146; Heath Beams Depo. at 25-26,31-32). Northport police officer Mike Pate turned on his blue lights and pulled over behind Mr. Beams. (M.Pate affidavit). Officers Zilke and Dyer saw Mr. Beams traveling southbound in the northbound turn lane at 55 to 60 miles per hour in a 35 mile per hour speed zone with Officer Pate following. (Zilke and Dyer affidavits). Officer Pate motioned for Mr. Beams to turn into the Northport Civic Center parking lot. (Charles Beams Depo. at 148; Heath Beams Depo. at 26).[3] Mr. Beams drove another 50 to 100 yards in the turn lane before turning left into the Civic Center parking lot and stopping.

When both Mr. Beams and the police car stopped in the Civic Center parking lot, Mr. Beams rolled down his window. He hollered to Officer Pate that Heath was choking and he needed to get him to the hospital. (Charles Beams Depo. at 149-150,163-164; Heath Beams Depo. at 26,35). Charles and Heath Beams waited 1 to 3 minutes for the officer in the police car behind them to do something. At this time Mr. Beams opened his car door and again yelled back at the office in the police car saying "Hey, what is going on, my son is choking." (Charles Beams Depo. at 150).

---

[3]  The Northport Civic Center parking lot is apparently shared by Northport City Hall and Northport Fire Department. (See M. Pate Affidavit). Beams refers to the parking lot as the Civic Center parking lot while Officer Pate refers to it as the City Hall parking lot. Pate further states that the Fire Department was located at the other end of the Northport City Hall.

2

Officer Pate continued sitting in his car (Charles Beams Depo. at 150) while he radioed headquarters to give his location. He asked the dispatcher to run the license tag on Mr. Beams's vehicle–as part of a standard procedure. (M.Pate affidavit). As Officer Pate stepped out of his vehicle, Mr. Beams began to pull away. (M.Pate affidavit). Another Northport police car, occupied by officers Zilke and Dyer, then entered the Civic Center parking lot. They pulled in front of the Mr. Beams's car, partially blocking it in. (Charles Beams Depo. at 164-165; Heath Beams Depo. at 26). At this time defendant Officer Terry Zilke (Zilke) came up to the Mr. Beams's car and asked Mr. Beams, "What is going on..." to which Mr. Beams explained "my son [is] choking and that I need [ ] to get him to the hospital." (Charles Beams Depo. at 172-173,226-227). Officer Dyer asked Heath if he could breathe and Heath nodded yes. (Charles Beams Depo. at 173). Officer Zilke then said "this is not a medical emergency" and that he would call an ambulance. (Charles Beams Depo. at 173). Officer Zilke radioed for the Northport Fire Department paramedics and an ambulance within one minute after assisting Officer Pate in stopping Mr. Beams's vehicle. (Zilke affidavit). The Northport Fire Department is located at the other end of the City Hall parking lot where the stop occurred. (M.Pate affidavit).

Officer Zilke asked for Mr. Beams's driver's license, which was given to him, while Mr. Beams begged, "please let us go." (Charles Beams Depo. at 173,180). Officer Zilke then told Mr. Beams that he was "driving reckless." (Charles Beams Depo. at 173). Officer Zilke asked Officer Dyer "did you see the way he was driving." (Charles Beams Depo. at 184). Mr. Beams told Zilke about Heath's medical history and told Officer Zilke "I can't believe you are detaining me here while my son is over here with saliva dripping out of his mouth and can't breath[e], just barely." (Charles Beams Depo. at 175,227). The Northport Fire Department paramedics arrived on the scene quickly. Captain Kenneth Pate of the paramedics examined Heath and told Officer Zilke that Heath

3

"needed to be hospitalized because he had an obstructed airway" and, further, that Mr. Beams "needs to go on [to the emergency room]." (Charles Beams Depo. at 175,188, 189).[4] Captain Pate told Zilke that Charles Beams could "be at the hospital in two minutes and he didn't need to wait on an ambulance here probably for 15 minutes." (Charles Beams Depo. at 189). Officer Zilke responded "[w]ell he is endangering lives, he is not going anywhere." (Charles Beams Depo. at 189). Charles Beams then said:

> If you got a problem with me, arrest me, if I have done something wrong, ... but I have not done anything wrong. I flagged the policeman down trying to get held and I went through this ordeal, I am not waiting on an ambulance and you can do whatever you want to do, follow me down to the hospital, arrest me. But ... I am leaving here and taking my son to the hospital. Now you do what you have to do. (C.Beams depo., pg. 189-190).

To which Officer Zilke again replied "you are not going anywhere." (Charles Beams Depo. at 190).[5]

Within two to three minutes after the paramedics arrived on the scene, Mr. Beams left the scene of the stop. As he looked towards Officer Zilke, Mr. Beams observed that Officer

---

[4] The affidavit of Captain Pate disputes the testimony of Charles Beams concerning whether the airway was obstructed:
> My primary assessment showed that the patient, later identified as Heath Beams, breathing was normal. <u>Heath Beams' airway was clear at the time of my assessment and there was no obvious respiratory compromise.</u> The father, Charles Beams, advised me of the Heath Beams medical history and I became concerned about the location of the pill, above the trachea and the possibility that the trachea could become occluded.

(K.Pate affidavit) (emphasis added).
For the purposes of this Memorandum of Opinion Mr. Beams's rendition is assumed to be correct.

[5] Officer Zilke stated in his affidavit that "after the paramedics recommendation, I immediately told Charles Beams to proceed but told him to slow down and obey all traffic laws en route to the hospital." (Zilke affidavit; see also affidavits of Officers Dyer and Pate and Captain Pate of the Northport Fire Department Paramedics).

Zilke "kind of brought his hand back up towards his gun" which made Mr. Beams feel "very threatened." (Charles Beams Depo. at 190).

Heath was admitted to the emergency room at Northport DCH Hospital at 7:50 a.m. where he was given a muscle relaxer and prepped for surgery to remove the pill from his throat. (Charles Beams Depo. at 192-193). Heath was to go into surgery; however, the pill went down making surgery unnecessary. (Charles Beams Depo. at 193; Heath Beams Depo. at 27).

From the time that Officer Zilke's patrol car pulled up and partially blocked Mr. Beams's automobile to the time Mr. Beams drove off was "roughly 10-15 minutes" according to Mr. Beams's estimate. (Charles Beams Depo. at 240). According to the dispatch tape and radio log maintained by the Northport Police Department,[6] the stop lasted approximately 6 minutes, including the following events:

    (a)    Officer Zilke calls for Fire Department paramedics from Fire Station No. 1 and also call for an ambulance;

    (b)    Northport Fire Department paramedics, Engine No. 1 responds that they are en route;

    (c)    Northport Fire Department paramedics clear from the scene and indicate that they are back in service;

    (d)    Zilke and other officers clear from the scene.

(Lieb Affidavit).

Subsequent to the incident which is the subject of this suit, the Northport Police Department promulgated a <u>written</u> policy which became effective after March 20, 1998 regarding

---

[6] Plaintiffs have not challenged the accuracy or validity of the dispatch tape.

5

"CIVILIAN VEHICLES – MEDICAL EMERGENCIES." (Plaintiffs' Northport Police Exhibit, Ron Davis letter of October 29, 1999). According to this policy:

> [T]he officer shall determine from the driver, whether:
>
> (1) The driver prefers that an ambulance be called to finish the transport;
>
> or
>
> (2) The driver prefers to proceed to an emergency medical treatment facility.

(Northport Policy Exhibit). Prior to the traffic stop and detention at issue here, it was the officer's decision which course of action to follow:

> ... At the time of [t]his incident, when an officer encountered a private vehicle transporting a medical emergency, <u>the officer had the discretion</u> to call an ambulance or to allow the vehicle to proceed.
>
> . . . .
>
> When faced with situations where a private vehicle is transporting a medical emergency, police officers have to use their discretion, as there is no hard and fast rule as to how each situation should be handled.

(Galloway Affidavit) (Emphasis added).

I. <u>Whether Officer Zilke's conduct amounted to a violation of Beamses' constitutional rights.</u>

Officer Zilke argues that he is entitled to summary judgment because he did not violate plaintiffs' Fourth Amendment rights. He further argues that his liability exposure is shielded by the doctrine of qualified immunity.

> In evaluating qualified immunity, courts "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was

6

> clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)). "If a plaintiff has not sufficiently alleged a violation of *any* constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a 'clearly established' right." *GJR Invs., Inc.*, 132 F.3d 1359, [ ] 1367 [11th Cir. 1998)].

*Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1285-86 (11th Cir. 2000).

The court need not address the applicability of qualified immunity because, as discussed below, plaintiff has failed to allege the deprivation of an actual constitutional violation. *Id.*; *Campbell v. Sikes*, 169 F.3d 1353, 1361-62 (11th Cir. 1999); *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000), *cert. denied*, ___ U.S. ___, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001).

In *Whren v. United States*, 517 U.S. 806, 809-10 (1996) the United States Supreme Court recognized that temporary detention during a traffic stop constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. The court stated:

> An automobile stop is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.

Id.

The court also stated:

> It is of course true that in principle every Fourth Amendment case, since it turns upon a "reasonableness" determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause.

> . . . .
>
> > Where probable cause has existed, the only cases in which we have found it necessary actually to perform the "balancing" analysis involved searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests–such as, for example, seizure by means of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)., unannounced entry into a home, see *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), entry into a home without a warrant, see *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), or physical penetration of the body, see *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

517 U.S. at 817.

It is undisputed that the officers observed Mr. Beams driving in heavily congested traffic at 55 to 60 miles per hour in a 35 mile per hour zone while traveling southbound in a northbound turn lane. *Alabama Code* § 32-5A-190 defines and prohibits reckless driving:

> (a) Any person who drives any vehicle carelessly and heedlessly in willful or wanton disregard for the rights or safety of persons or property, or without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving.

Mr. Beams does not, and cannot based on these facts, dispute that the officers had probable cause to stop Mr. Beams's automobile. The question is whether the length of the detention rendered the duration of the stop unconstitutional. In *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001) the Eleventh Circuit Court of Appeals discussed the acceptable duration of a traffic stop:

> [T]he duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop. *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last "any

> longer than necessary to process the traffic violation."
> *United States v. Holloman*, 113 F.3d 192, 196 (11th Cir. 1997).

In *Purcell* the Eleventh Circuit held that fourteen minutes was not an unreasonable amount of time for a traffic stop. In fact, the court observed "we have approved traffic stops of much longer duration." *Purcell*, 236 F.3d at 1279.

This case is certainly not a usual traffic stop case. The court has discovered only one case even remotely similar. *Eubanks v. Lawson*, 122 F.3d 639 (8th Cir. 1997). In *Eubanks*, the court affirmed the district court's order denying the defendant's motion for summary judgment. *Eubanks*, however, involved an investigative stop without probable cause rather than a traffic stop with probable cause. The injured man was not provided any medical attention while awaiting arrival of the ambulance and the detention lasted 30 to 40 minutes.

Based upon the facts of the case before the court, a six to fifteen minute detention cannot be deemed to be constitutionally unreasonable. Mr. Beams was stopped for reckless driving. The police did not act improperly in calling in his tag number, checking his driver's license or attempting to determine the cause for his recklessness. Upon learning of Heath's medical condition it was also appropriate for the police to summon paramedics to determine his need for immediate treatment and an ambulance to transport him if immediate treatment was necessary. The delay which resulted from the summoning and arrival of paramedics was minimal as the Fire Department was contained within the same complex where the stop occurred. After Captain Pate suggested that Mr. Beams be allowed to transport his son, Mr. Beams left the scene of the traffic stop and drove Heath to a local hospital where he was treated.

The police were not blind to Heath Beams's plight. Heath was asked if he could breathe and he nodded yes. In addition, he was examined by the paramedics. Further, an ambulance

9

was summoned at the same time that the paramedics were called; however, the ambulance did not arrive before the Beamses' departure.

The court concludes that Officer Zilke's conduct did not violate the constitutional rights of plaintiffs. As the court has concluded that the conduct of Officer Zilke did not rise to the level of a constitutional violation, it is unnecessary to further consider the theory of liability plaintiff asserts against the City of Northport. *See Rooney v. Watson*, 101 F.3d 1378, 1381 n.2 (11th Cir. 1996), *cert. denied,* 522 U.S. 966 (1997).

II.     Alternative discussion on qualified immunity.

Although the evidence does not establish a constitutional deprivation the issue of qualified immunity is addressed below.

The relevant concept of qualified immunity was summarized in *Wilson v. Strong*, 156 F.3d 1131 (11th Cir. 1998):

> Qualified immunity shields a § 1983 defendant from liability for harms arising from her discretionary acts, so long as her acts do not violate any clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir.) *(en banc), cert. denied,* ___ U.S. ___, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir. 1994) *(en banc).* To be clearly established, the contours of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Williams v. Alabama State Univ.,* 102 F.3d 1179, 1182 (11th Cir. 1997). "[I]n the light of pre-existing law, the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *Madiwale*

> > *v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir. 1997) [*cert. denied,* 523 U.S. 1117 (1998)]
>
> > . . . .
>
> > ... "Qualified immunity focuses on the actual, specific details of concrete cases." *Walker v. Schwalbe,* 112 F.3d 1127, 1132 (11th Cir. 1997).

156 F.3d at 1134.

The court further held:

> > ... [i]n this circuit, the law can be "clearly established" for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins,* 115 F.3d at 826 n.4.

156 F.3d at 1135.

      The court is unaware of any authority from the United States Supreme Court, Eleventh Circuit Court of Appeals or the Alabama Supreme Court sufficiently factually similar that would have made Officer Zilke's alleged unlawfulness apparent. On January 27, 1998, defendant Zilke would not have known, in the absence of controlling case law, that his stop of a vehicle for reckless driving and brief detention of the vehicle and occupants while summoning medical aid for the passenger would violate the Fourth Amendment rights of occupants even though the detention lasted no more than 6 to 15 minutes.

III.    <u>Alternative discussion on municipal liability</u>.

      The claim against the City of Northport must also fail. Plaintiff argues that the policy in effect on January 27, 1998 was the same as the written policy subsequently promulgated. Based upon the exhibits submitted, it is clear that plaintiff is mistaken concerning the policy in effect in January 1998. The policy in effect in January 1998 allowed the officer discretion in deciding

whether to allow a vehicle to proceed to the hospital or to call an ambulance. (Galloway Affidavit). Plaintiff has failed to show that the alleged constitutional deprivation was the result of a municipal custom or policy. *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Plaintiff has also failed to show the alleged deprivation was the result of the City of Northport's failure to train or supervise Officer Zilke which "evidences a deliberate indifference to the rights of its inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Defendants are entitled to summary judgment in their favor on plaintiffs' federal claims (counts I and IV). The court declines to exercise supplemental jurisdiction over the state law claims which are the only claims remaining. 28 U.S.C. § 1367(c)(3). The state law claims are due to be dismissed without prejudice to plaintiffs' right to refile them in state court.

Based on the foregoing, a separate Final Judgment consistent with this Memorandum of Opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 30 day of March, 2001.

_____
PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE